IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH PRITT, | ) | Case No. 1:21-cv-1728 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

Plaintiff, Joseph Pritt, seeks judicial review[1] of the final decision of the Commissioner of Social Security, denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act.  Pritt challenges the Administrative Law Judge's ("ALJ") negative findings, contending that the ALJ: (i) erred in determining that he did not satisfy the criteria for Listing 11.09; (ii) misevaluated the opinions of his treating neurologist, Rodica Di Lorenzo, MD; and (iii) misevaluated his subjective symptom complaints of pain and fatigue.

Because any error in the ALJ's analysis of the Listing 11.09 criteria was harmless and because the ALJ otherwise applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Pritt's applications for DIB and SSI must be affirmed.

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  ECF Doc. 7.

I.      **Procedural History**

On June 6, 2019, Pritt applied for DIB and SSI.  (Tr. 185, 192).[2]  Pritt alleged that he

became disabled on April 27, 2019, due to multiple sclerosis.  (Tr. 185, 192, 211).  The Social

Security Administration denied Pritt's application initially and upon reconsideration.  (Tr. 50-63,

66-87).  Pritt then requested an administrative hearing.  (Tr. 137).

On October 5, 2020, ALJ Peter Beekman heard Pritt's case and denied his application in

an October 19, 2020 decision.  (Tr. 13-27, 31-43).  In doing so, the ALJ determined at Step

Three of the sequential evaluation process that Pritt's physical impairment did not satisfy the

criteria for Listing 11.09[3].  (Tr. 34).  At Step Four, the ALJ determined that Pritt had the residual

functional capacity ("RFC") to perform sedentary work, except that:

> [Pritt] can frequently foot pedal bilaterally; frequently climb ramps and stairs;
> never climb ladders, ropes, or scaffolds; and frequently balance, stoop, kneel,
> crouch, and crawl.  He can frequently reach, handle, finger, and feel.  He should
> avoid high concentrations of extreme cold and extreme heat, and avoid all
> exposure to dangerous machinery and unprotected heights.  [Pritt] can do no
> complex tasks, but can perform simple (routine) tasks, which I define to mean he
> has the basic mental demands of competitive, remunerative, unskilled work
> including the abilities to, on a sustained basis, understand, carry out, and
> remember simple instructions.  He can respond appropriately to supervision,
> coworkers, and usual work situations; and deal with changes in routine work
> settings.  [Pritt] can focus attention on simple or routine work activities for at least
> 2 hours at a time and stay on task at a sustained rate such as initiating and
> performing a task that he understands and knows how to do.  He can work at an
> appropriate and consistent pace; can complete tasks in a timely manner; can
> ignore or avoid distractions while working; and can change activities or work
> settings without being disruptive.

(Tr. 35-36).

Based on vocational expert ("VE") testimony that an individual with Pritt's age,

experience, and RFC could perform other work, the ALJ determined that Pritt was not disabled.

---

[2] The administrative transcript appears in ECF Doc. 8.
[3] The ALJ made other negative Listings findings, none of which Pritt has challenged.

(Tr. 42-43).  On July 23, 2021, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).  On September 7, 2021, Pritt filed a complaint to obtain judicial review.  ECF Doc. 1.

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Pritt was born on July 7, 1975 and was 43 years old on the alleged onset date.  (Tr. 50, 185).  Pritt had an 11th grade education and no specialized or vocational training.  (Tr. 212).  He had past work as a material handler, hand packager, and plater, which the ALJ determined he was unable to perform.  (Tr. 41, 212, 217).

### B.    Relevant Medical Evidence

On November 30, 2017, Pritt visited MetroHealth Medical Center ("MetroHealth").  (Tr. 1046).  Pritt reported that while cutting food he felt a nerve pinch in his neck that caused pain and his left arm to go numb for 30 minutes.  (Tr. 1046-47).  Pritt reported that he felt sensation returning but still felt some tingling.  *Id.*  On physical examination, Pritt had unremarkable results.  (Tr. 1047).  An historical cervical spine x-ray from 2014 showed C5-C6 degenerative changes.  *Id.*  A new x-ray of the cervical spine showed progression of cervical spondylosis with neural foraminal narrowing at C5-C6 and C6-C7.  (Tr. 1099).  Pritt was diagnosed with osteoarthritis of the cervical spine with radiculopathy, neck pain, and trapezius muscle strain and prescribed Voltaren and Flexeril.  (Tr. 1048).

On December 6, 2017, Pritt visited Antwon Morton, DO, for a follow-up on his neck pain, reporting that the medication didn't much help.  (Tr. 1045).  Pritt reported that his neck range of motion was limited by pain, which he rated at 9/10 in intensity, and that he felt numbness radiating into his left hand.  (Tr. 1045).  Pritt also reported pain when raising his arm

3

above shoulder height.  *Id.*  Upon physical examination, Pritt had: (i) cervical paraspinal tenderness; (ii) decreased lateral bending range; (iii) tenderness over the greater occipital nerves; (iv) paraspinal spasm; (v) severe left posterior pain upon axial compression; and (vi) decreased light tough sensation in the "C5, C6 left upper limb dermatomes."  (Tr. 1046).  A 2015 MRI of the right shoulder showed findings characteristic of a Buford complex.  (Tr. 1045).  Dr. Morton diagnosed Pritt with acute cervical pain flare and cervical spondylosis with left upper extremity radicular syndrome.  (Tr. 1046).  Dr. Morton provided Pritt a Medrol Dosepak and advised Pritt to continue a home exercise program once his pain was better controlled.  *Id.*

Between December 13 and 29, 2017, Pritt repeatedly called MetroHealth to report severe neck pain and, after starting Mobic, severe headaches.  (Tr. 1039-42).  Pritt was not seen by Dr. Morton again until May 3, 2018.  (Tr. 1030).

On May 3, 2018, Pritt reported to Dr. Morton that he had strained his back two weeks prior and had constant numbness from the umbilical region downwards ever since.  (Tr. 1030).  Pritt also reported: episodes of leg buckling two to three times per week; hand numbness and difficulty grabbing objects; off-and-on hot and cold sensations in his lower extremities; neck pain rated at 8/10 in intensity; and gait disturbance.  *Id.*  On physical examination, Pritt had similar results to his previous visit except that he also had: (i) decreased light touch sensation "[f]rom umbilical region and all dermatomes in BLE's"; (ii) 4/5 hand grip strength; and (iii) slightly antalgic gait "for first few steps."  (Tr. 1031).  Dr. Morton diagnosed Pritt with cervical spondylosis/myelopathic symptoms, lumbar myelopathic symptoms, and gait disturbance and ordered MRI testing.  *Id.*

On May 9 and 10, 2018, Pritt called MetroHealth to report numbness radiating from his abdomen downwards; numbness in his right hand and fingers; pressure on his abdomen after

walking 10-15 minutes; falls from his leg giving out; and that his thighs felt heavier after walking.  (Tr. 1028-29).

On May 17, 2018, Pritt underwent MRI examination of the cervical and thoracic spine. (Tr. 1120).  The results of MRI testing showed: (i) solitary, short-segment spinal cord lesion with incomplete ring enhancement at the C4-C5 level, which was "very suspicious" for a demyelinating lesion; and (ii) cervical spondylosis with spinal canal stenosis and mild cord flattening at C4-C5 and C5-C6, with moderate to severe neural foraminal stenosis at C5-C6.  (Tr. 1121).

In June 2018, Pritt underwent MRI examination of the brain, the results of which showed no acute intracranial abnormality or evidence of a demyelinating disease.  (Tr. 1025, 1120).

On July 10, 2018, Pritt returned to Dr. Morton, reporting that his abdominal and lower extremity numbness had "improved/resolved," he no longer experienced off-and-on hot and cold sensations, and he rated his pain at 4/10 intensity.  (Tr. 1024).  Pritt continued to report, however, hand numbness and difficulty grabbing objects.  *Id.*  On physical examination, Pritt had: (i) cervical paraspinal tenderness; (ii) decreased lateral bending range of motion; (iii) tenderness over the greater occipital nerves; (iv) paraspinal spasm; (v) severe left posterior neck pain upon axial compression; (vi) decreased light touch sensation in the C5, C6, and left upper limb dermatomes; (vii) 4/5 hand grip strength; (viii) no right patellar reflex; and (ix) "reciprocal" gait. (Tr. 1025).  Dr. Morton diagnosed Pritt with cervical spondylosis with upper extremity radicular symptoms, noting that his lumbar myelopathic symptoms and gait disturbance had "resolved." *Id.*  Dr. Morton continued Pritt's medication treatment with Mobic and Flexeril and wrote a letter with three months of work restrictions.  *Id.*

On December 26, 2018, Pritt requested from MetroHealth a letter increasing the number of days off work due to worsening neck pain and decreased range of motion. (Tr. 1019). Pritt rated his pain as ranging from 6-8/10 in intensity. *Id.* He also reported distal forearm pain, chronic paresthesia in his hands, and new numbness in his wrists. *Id.* On physical examination, Pritt had: (i) decreased cervical spine range of motion; (ii) tenderness at C4, C5, C6, and C7; (iii) neck pain with spurling maneuver; (iv) decreased sensation in the C6 dermatomes; (v) normal strength throughout; and (vi) normal gait. (Tr. 1021). The attending nurse practitioner prescribed Neurontin and prednisone and referred Pritt for a neurology evaluation. *Id.*

On February 6, 2019, Pritt visited neurologist Rodica Di Lorenzo, MD, for an evaluation. (Tr. 1015). Pritt reported off-and-on left eye pain with poor vision and numbness in his hands and feet. (Tr. 1015-16). On physical examination, Pritt had unremarkable results. (Tr. 1017-18). Dr. Di Lorenzo diagnosed Pritt with demyelinating disease of the central nervous system based on the abnormal spinal MRI results, Pritt's history of left-sided eye pain, and family history of multiple sclerosis. (Tr. 1018). Dr. Di Lorenzo ordered additional lab testing to rule out neuromyelitis optica. *Id.*

On March 21, 2019, Pritt visited Dr. Morton, reporting worsening neck pain with limited neck range of motion, distal forearm pain, hand paresthesia, and wrist numbness. (Tr. 1011-12). On physical examination, Pritt's results were similar to that of his December 26, 2018 visit. (Tr. 1013). Dr. Morton refilled Pritt's medication and instructed him to follow up with neurology. *Id.*

On April 9, 2019, Pritt returned to Dr. Di Lorenzo, reporting new onset of left face numbness, with numbness in the back half of the tongue as well. (Tr. 1008-09). Pritt also

reported dizziness, lightheadedness, and brief (10-30 minutes) left-sided headaches and retro-orbital pains.  (Tr. 1009).  On physical examination, Pritt had difficulty smiling and opening his mouth and had decreased facial light touch sensation.  (Tr. 1010).  Dr. Di Lorenzo diagnosed Pritt with trigeminal neuropathy, prescribed Trileptal, and ordered a new MRI of Pritt's head. (Tr. 1010-11).

On April 23, 2019, Pritt underwent a second MRI of his head, the results of which showed a nonspecific cortical, juxtacortical and periventricular lesion.  (Tr. 1089).

On April 25, 2019, Pritt visited MetroHealth's emergency department, reporting lightheadedness, headache, and imbalance.  (Tr. 978).  On physical examination, Pritt had unremarkable results except decreased sensation to the left side of the face.  (Tr. 979-80).  Pritt was given medication, after which his headache improved, and he was admitted for inpatient monitoring.  (Tr. 980).

On April 26, 2019, Pritt underwent a second neurology consultation with Dr. Di Lorenzo. (Tr. 992-93).  On neurologic examination, Pritt's results were unremarkable.  (Tr 994-95). Dr. Di Lorenzo recommended that Pritt be treated for a clinical multiple sclerosis flare.  (Tr. 995-96).  Pritt was discharged on April 27, 2019 in stable condition with a referral for physical therapy.  (Tr. 991-92).

On April 27, 2019, Pritt visited Nicole Palumbo, PT, for a physical therapy evaluation. (Tr. 998).  Pritt reported that he was always dropping things and gave as an example not noticing dropping a cigarette before taking a drag.  (Tr. 999).  He reported that he could ambulate without an assistive device and worked part-time in manual labor.  *Id.*  On objective examination, Pritt had: (i) left facial droop; (ii) headache pain reported at 4/10 in intensity; (iii) passive range of motion within functional limitations; (iv) 4- to 4/5 left extremity active range of motion;

(v) slow, steady gait for 150 feet with not assistive device; and (vi) endurance within functional limitations.  (Tr. 999-1000).  On a basic mobility and daily activity test, Pritt did not require any help and could perform the activities tested independently.  (Tr. 1000, 1002).  Physical Therapist Palumbo found no balance deficits and no acute need for physical therapy.  (Tr. 1000).

Pritt also underwent an occupational therapy evaluation with Catherine Szado, OT.  (Tr. 1000).  Pritt's examination results were remarkable for decreased hand dexterity and 3+/5 overall bilateral upper extremity strength.  (Tr. 1001).  Occupational Therapist Szado recommended occupational therapy to address dexterity and upper extremity strengthening.  (Tr. 1002).

On May 6, 2019, Pritt visited Jean Monateri, CCC-SLP, for a speech-language pathology evaluation.  (Tr. 960).  Pritt reported slowness, fatigue with eating, decreased taste sensation, pain, weakness, and dizziness.  (Tr. 960-61).  Pritt reported that, because of his physical impairments, he was no longer working and was trying to find ways to contribute to the household while taking enough breaks to sit.  (Tr. 961).  After examination, Speech-Language Pathologist Monateri determined that Pritt was within functional limitations to mild impairment.  (Tr. 962).  Pritt was diagnosed with mild cognitive communicative disorder, mild dysarthria, and mild suspected oral to possibly pharyngeal dysphagia.  (Tr. 963).

Between May and June 2019, Pritt attended regular physical, occupational, and speech-language therapy visits.  *See* (Tr. 891-960, 965-74).  Over the course of his physical therapy visits, Pritt reported fatigue, widespread pain, diminished arm strength, headache pain rated at 6/10 in intensity, neck pain rated ranging from 2-8/10 in intensity, lower extremity pain ranging from 2-7/10 in intensity, slow ambulation, and dizziness with falls.  (Tr. 901, 908, 927-28, 930-31, 940, 948, 968-69).  Pritt was prescribed a cane on May 3, 2019, which he started using on May 23, 2019.  (Tr. 927, 931, 960, 964-65).  By the conclusion of physical therapy, Pritt could:

(i) ambulate 250 feet with a cane; (ii) move up/down from surfaces with support; (iii) pick up items from the floor; and (iv) climb/descend three flights of stairs with one rail.  (Tr. 903-04). Pritt's objective examination results showed diminished lower left extremity strength, including 3/5 ankle strength, knee flexion, and hip adduction and extension.  (Tr. 902).

Over the course of Pritt's occupational therapy visits, he reported dizziness, lightheadedness with ambulation, fatigue difficulty with using harms overhead, pain ranging from 0/10 to 7/10 in intensity, frequent dropping of items, and reliance on his wife for help with activities of daily living.  (Tr. 899-900, 906, 913, 915-16, 944, 946, 954, 965-67).  On physical examination, Pritt had: (i) decreased shoulder range of motion (-3/4); (ii) decreased DIP joint flexion; (iii) 1/2 wrist flexion and extension; (iv) decreased strength, including 3+/5 wrist flexion and right elbow flexion; and (v) impaired light touch sensation and constant numbness and tingling.  (Tr. 966).  Over the course of Pritt's speech-pathology therapy visits, he reported occasional choking when eating flaky solids, tiredness, and unsteady gait.  (Tr. 891, 904-05, 939).

Meanwhile, Pritt visited Dr. Di Lorenzo on May 7, 2019, reporting two falls due to his right leg giving out, lightheadedness when walking fast, extremity muscle cramps, improved facial pain, and leg tingling.  (Tr. 956-58).  On physical examination he had no less than 4/5 muscle strength and unremarkable neurologic examination results.  (Tr. 959).  Dr. Di Lorenzo prescribed a four-pronged cane for his difficulty walking and continued his medication treatment.  (Tr. 960).

On May 23, 2019, Pritt visited Dr. Morton, reporting fatigue, arm strength at 30%, headache pain rated at 6/10 in intensity, and neck pain rated at 5/10 with radiation into his shoulders.  (Tr. 926-27).  On physical examination, Pritt had 2/5 and 3/5 plantar flexion strength,

abnormal sensation, and abnormal gait with a cane.  (Tr. 929-30).  Dr. Morton diagnosed Pritt

with dysphagia from his multiple sclerosis; suspected that Pritt's neck pain was either spondylitic

pain from facet arthropathy or myofascial pain from multiple sclerosis; and stated that it was

unclear what the etiology was of Pritt's headaches.  (Tr. 930).

On June 11, 2019, Pritt returned to Dr. Di Lorenzo, reporting that he used a four-pronged

cane to ambulate, still had some facial numbness but no facial pain, felt used to his headaches,

lightheadedness with ambulation, right-sided weakness, and decreased sensation in his hands.

(Tr. 894-96).  On physical examination, Pritt had no less than 4/5 muscle strength results,

unremarkable neurologic examination results, intact sensation, and normal but slow gait.  (Tr.

897-98).  Dr. Di Lorenzo noted that Pritt's multiple sclerosis was slowly improving since he

started Tecfidera and continued his medication treatment.  (Tr. 898).  Pritt indicated that he did

not want medication for his headaches.  *Id.*

On August 4, 2019, Pritt presented to MetroHealth's emergency department with acute

onset of upper extremity weakness and numbness.  (Tr. 878).  Pritt reported that he had passed

out after being outside helping a neighbor.  *Id.*  When he awoke, he was unable to move his arms

and legs.  *Id.*  He reported that syncope episodes happened "frequently with exercise and heat."

*Id.*  On physical examination, Pritt had diminished sensation in the fifth cranial nerve; partial left

facial palsy; diminished (3/5) grip, wrist, elbow, and shoulder muscle strength; and reduced

sensation from shoulders to fingers.  (Tr. 880).  MRI examination of Pritt's cervical spine

showed less conspicuous short-segment spinal cord lesion at the C4-C5 level when compared to

his previous MRI.  (Tr. 1059).  While at the emergency department, his weakness and numbness

gradually resolved, and he was discharged in stable condition.  (Tr. 880-81).

On August 15, 2019, Pritt visited MetroHealth for a follow-up on his hospital visit.  (Tr. 1213-14).  Pritt reported improvement since avoiding heat, with his arm and weakness returning to baseline.  (Tr. 1214).  He also reported arm cramping.  *Id.*  On physical examination, Pritt had unremarkable results except left facial droop, decreased (4/5) right upper extremity strength, slow fine finger movements, steady gait with cane, and 2/4 reflexes.  (Tr. 1215-16).  The attending physician continued Pritt's medication treatment and recommend that he avoid heat.  (Tr. 1217).

On August 29, 2019, Pritt visited Dr. Morton, reporting improved neck pain and range of motion but worsening distal forearm pain.  (Tr. 1270).  He reported that his pain ranged from 6-8/10 in intensity and that he had felt dizzier and more fatigued.  *Id.*  On physical examination, Pritt had: (i) decreased cervical lordotic curvature; (ii) decreased cervical range of motion; (iii) tenderness at C4, C5, C6, and C7; (iv) pain with spurling maneuver; (v) full strength; (vi) decreased sensation at B C6 dermatomes; and (vii) no ankle reflex.  (Tr. 1271-72).

On November 14, 2019, Pritt visited MetroHealth for a follow-up on his hospital visit.  (Tr. 1263).  Pritt reported hip pain when lying down, which began in October.  (Tr. 1264).  He also reported tingling and shooting sensation in his legs, and occasional falls.  *Id.*  On physical examination, Pritt had unremarkable results except left facial droop, 4/5 right upper extremity strength, decreased ability to move right fingers (4/5), decreased right vibratory sensation, slow fine finger movements, 2/4 reflexes, and steady gait with a cane.  (Tr. 1265).

On December 12, 2019, Pritt's physical examination results with Dr. Morton were similar to his August 29, 2019 visit.  (Tr. 1260-61).

On February 19, 2020, Pritt returned to Dr. Di Lorenzo.  (Tr. 1360-61).  Pritt reported "passing out spells" after pushing himself too much and that he no longer got frequent

headaches. (Tr. 1361-62). He reported that his energy and mood varied, with good and bad days; he had some slurring when talking fast; he had right upper extremity weakness; he had sensory loss in both legs and right upper extremity; he used a cane to ambulate; and his gait and balance were "ok." (Tr. 1362). On physical examination, Pritt had: (i) decreased left-sided light touch facial sensation; (ii) 4/5 strength in the right extremities; (iii) decreased light touch sensation in the right extremities; and (iv) no difficulty rising from a sitting position. (Tr. 1365). Dr. Di Lorenzo ordered updated MRIs. (Tr. 1365).

On May 9, 2020, Pritt underwent MRI testing, the results of which showed no new lesions and that the previous lesions were less distinct or no longer visible. (Tr. 1429).

On June 25, 2020, Pritt visited Dr. Morton, reporting the same symptoms as his previous visit and additionally reporting that he was dropping things intermittently. (Tr. 1415-16). On objective examination, his results were similar to his December 2019 visit. (Tr. 1417-18).

On August 25, 2020, Pritt visited Dr. Di Lorenzo for a follow-up. (Tr. 1425-26). Pritt reported that he was doing "ok" and that his main problem was his right hand. (Tr. 1426). Pritt reported that he could not straighten out his fingers or make a fist, though he denied pain. *Id.* He reported right shoulder pain and inconsistent energy. *Id.* And he reported he'd had three falls since July. *Id.* On physical examination, Pritt had unremarkable results except 3-/5 grip strength and 4/5 right hip strength, decreased light touch sensation in the right upper and left extremities, no reflex in his biceps, 2/4 patellar reflex, difficulty rising from a seated position, and antalgic gait. (Tr. 1429).

C.      **Relevant Opinion Evidence**

1.      **Treating Source, Rodica Di Lorenzo, MD**

a.      **June 2019**

On June 14, 2019, Dr. Di Lorenzo completed a two-page form medical source statement that was provided by Pritt's attorney.  (Tr. 871-73).  The form consisted of 12 questions with checkbox and fill-in-the-blank answers.  (Tr. 872-73).  Six of the questions had a box next to it asking the doctor to identify the medical findings that supported her responses.  *Id.*

Dr. Di Lorenzo's answers stated that Pritt could: (i) lift 20 pounds occasionally and 5 pounds frequently; (ii) stand for a total of 4 hours, of which he could stand 30 minutes without interruption; (iii) sit without limitation; (iv) never climb or crawl; (v) rarely balance, stoop, crouch, kneel, push, or pull; (vi) rarely grossly manipulate objects; and (vii) occasionally reach and finely manipulate objects.  *Id.*  Dr. Di Lorenzo further stated that Pritt had been prescribed a cane, had moderate pain, needed to alternate positions at will, and that his pain would interfere with concentration and take him off task and would require two hours of rest in excess of standard rest periods.  (Tr. 873).

As medical findings in support, Dr. Di Lorenzo stated that: (i) Pritt's hand weakness and poor balance supported his lifting/carrying limitations; (ii) Pritt's poor balance, fatigue, and leg weakness supported his standing/walking limitations; (iii) Pritt's poor balance and leg weakness supported his postural limitations; and (iv) Pritt's hand weakness and numbness and poor balance supported his manipulative limitations.  (Tr. 872-73).  The form did not request medical findings to support her other answers.  *See* (Tr. 873).

13

b.      **February 19, 2020**

On February 19, 2020, Dr. Di Lorenzo completed another two-page form medical source statement given to her by Pritt's counsel.  (Tr. 1371-73).  Dr. Di Lorenzo's answers indicated that Pritt could: (i) carry/lift up to 4 pounds occasionally and 2 pounds frequently; (ii) stand/walk for a total of 1 hour and for a continuous period of 15 minutes; (iii) sit for a total of 6 hours and for a continuous period of 1 hour; and (iv) rarely perform any postural or manipulative activity. (Tr. 1372-73).  Dr. Di Lorenzo further opined that Pritt needed to alternate positions and elevate his legs to 45 degrees at will; that Pritt had moderate pain that would interfere with his concentration and cause him to be off task; and that Pritt required between 2 and 3 hours of rest time beyond the standard periods provided.  (Tr. 1373).

As medical findings in support, Dr. Di Lorenzo stated that: (i) Pritt's fatigue and right-sided weakness supported his lifting/carrying and standing/walking limitations; (ii) Pritt's leg cramps, which required him to get up periodically, supported his sitting limitations; (iii) Pritt's right-sided weakness, poor balance, fatigue, and leg cramps supported his postural limitations; and (iv) Pritt's right-sided weakness, poor balance, and difficulty with fine motor tasks supported his manipulative limitations.  (Tr. 1372-73).  The form did not ask for medical findings to support Dr. Di Lorenzo's other answers.  *See* (Tr. 1373).

2.      **Consultative Examiner, Dorothy Bradford, MD**

On March 5, 2020, Dorothy Bradford, MD, examined Pritt in connection with his disability application.  (Tr. 1374).  Pritt's chief complaints were multiple sclerosis and neck pain. *Id.*  Pritt reported that his multiple sclerosis symptoms were lower extremity numbness and tingling and right-hand weakness and numbness, with some improvement with Tecfidera.  *Id.* Pritt reported that his neck pain was due to spinal stenosis, for which he had received injections

14

and took gabapentin.  *Id.*  Pritt also reported shoulder pain.  *Id.*  On physical examination, Pritt

had unremarkable results, except: (i) decreased neck range of motion; (ii) right facial paralysis;

(iii) tongue deviation; (iv) decreased light touch and pinprick sensation in the right ulnar nerve;

(v) and decreased motor strength in the right ulnar nerve.  (Tr. 1375, 1376-80).  Pritt's hand

function was rated as "Good," with 5/5 left grip strength and 4/5 right grip strength.  (Tr. 1377,

1380).  Dr. Bradford opined that her exam findings and Pritt's medical records "support his

allegations;" and that Pritt was "unable to perform active or sedentary activity."  *Id.*

### 3.      State Agency Consultants

On January 15, 2020, Stephen Koch, MD, evaluated Pritt's physical capacity based on a

review of the medical record and determined that Pritt had the RFC to perform light work.  (Tr.

53-55).  Dr. Koch determined that Pritt could: (i) lift/carry 20 pounds occasionally and 10

pounds frequently; (ii) stand/walk for up to 4 hours; (iii) sit for up to 6 hours; (iv) occasionally

climb ramps/stairs, balance, stoop, stoop, kneel, or crouch; and (v) never crawl or climb

ladders/ropes/scaffolds.  (Tr. 54-55).  On April 9, 2020, Gary Hinzman, MD, concurred with

Dr. Koch's assessment of Pritt's physical RFC, except he additionally determined that Pritt could

never crouch.  (Tr. 73-75).

### D.      Relevant Testimonial Evidence

Pritt testified at the ALJ hearing that he was unable to work because of right-arm

weakness, difficulty with prolonged walking and standing, and fatigue.  (Tr. 16).  Pritt testified

that because of his weakness he was unable to lift or carry any weight.  (Tr. 17).  He testified that

he also could not spread his fingers or "pick anything too much."  (Tr. 16-17).  He was unable to

button and often dropped items.  (Tr. 19).  And he had pain in his right shoulder.  (Tr. 20).  He

was not taking any medication specifically for his right extremity.  (Tr. 17).

15

With regard to walking and standing, Pritt testified that he used a four-pronged cane to walk distances over ten feet.  (Tr. 18).  He'd had a fall two weeks before the hearing.  *Id*.  And he felt tingling and numbness in his legs and hand.  (Tr. 20).  As to his fatigue, Pritt testified that he got tired quickly after moving around.  (Tr. 18).  His sleep was also affected by leg spasms, which he got two to three times per night.  (Tr. 19-20).  Pritt testified that he took two naps per day for between two- and two-and-a-half hours each.  (Tr. 20).

Pritt testified that his wife helped him with personal care.  (Tr. 20).  Specifically, she assisted him by helping him onto the bath seat, and helped him with washing his hair, shaving, and dressing.  *Id*.  Pritt testified that he avoided using stairs to prevent falling, so he did not do laundry.  (Tr. 20-21).  He was not allowed to cook because he often burned himself without knowing it.  (Tr. 21).  He grocery shopped occasionally with his wife.  *Id*.

The ALJ asked VE Mark Anderson to assume a hypothetical person of Pritt's age and background and who could: (i) lift/carry 10 pounds frequently and occasionally; (ii) stand/walk 2 hours; (iii) frequently use of a foot pedal; (iv) frequently use ramps or stairs; (v) frequently balance, stoop, kneel, crouch, and crawl; (vi) never climb a ladder, rope, or scaffold; (vii) perform simple routine tasks and remember simple instructions; (viii) respond appropriately to supervision, coworkers, and usual work situations; (ix) deal with changes in a routine work setting; (x) focus attention on simple and routine work activities for at least 2 hours at a time; (xi) stay on task at a sustained rate, such as initiating and perform a task he understood and knew how to do; (xii) work at a consistent pace and complete tasks in a timely manner; (xiii) avoid distractions while working; and (xiv) change activities or work setting without being disruptive. (Tr. 23-24).  The VE testified that the limitations were consistent with sedentary work and that the individual could work as a patcher, touch up screener, and table worker.  (Tr. 24).

16

The VE testified that his answers would be the same if the hypothetical person were further restricted to frequent reaching, handling, fingering, and feeling. *Id.* If the individual were limited to occasional overhead reach and occasional handling and fingering with the right dominant hand, the VE testified that the individual could work as a touch up screener, table worker, and bonder. (Tr. 25). If the individual were limited to occasional handling and feeling bilaterally, the VE testified the individual could only perform work as a callout operator. (Tr. 26). The VE testified that none of the jobs testified to were performed while ambulating, so the use of a cane would not affect his answer. (Tr. 25). And the VE testified that an employer would not tolerate an employee being off task for more than 15% of the time. (Tr. 26).

## III. Law & Analysis

### A. Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). And, even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'" *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Jones*, 336 F.3d at 477); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"). But, even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal

standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").  And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.").

## B.    Step Three – Listing 11.09

Pritt argues that the ALJ failed to apply proper legal standards and reach a decision supported by substantial evidence in finding that Pritt's multiple sclerosis did not meet or medically equal the requirements of Listing 11.09.  ECF Doc. 11 at 14-18.  Pritt argues that the ALJ failed to apply proper legal standards because one of the criteria the ALJ considered (reproducible fatigue) is not required by Listing 11.09, and the ALJ failed to provide sufficient explanation for his findings.  ECF Doc. 11 at 15, 17.  Pritt argues that the ALJ erred by relying on only four exhibits while ignoring medical records documenting Pritt's difficulties in the use of his extremities.  ECF Doc. 11 at 16.  Pritt argues that the evidence the ALJ failed to consider satisfied the criteria of Listing 11.09A.  *Id.*  And Pritt argues that one of the exhibits the ALJ relied on (Dr. Di Lorenzo's August 25, 2020 treatment notes) alone would have satisfied the requirements of Listing 11.09.  ECF Doc. 11 at 17.  Additionally, Pritt argues that he ALJ erred by not calling a medical expert to testify on the issue of medical equivalency.  ECF Doc. 11 at 18.

18

The Commissioner responds that the ALJ's consideration of a criterion not relevant under the current Listings was harmless because the substance of his analysis was nevertheless consistent with the requirements of the current Listings. ECF Doc. 13 at 13-14. The Commissioner argues that the ALJ reasonably determined that Pritt did not have disorganization of motor function, which was adequately supported by the four exhibits he cited. ECF Doc. 13 at 13. The Commissioner argues that the evidence Pritt cited in his brief does not undermine the ALJ's conclusion that Pritt's motor and sensory deficits did not rise to the level of "marked" or "extreme." ECF Doc. 13 at 15-16. And the Commissioner argues that there was sufficient evidence on the record from which the ALJ could determine the severity of Pritt's impairments. ECF Doc. 13 at 16-17.

At Step Three of the sequential evaluation process, a claimant has the burden to show that he has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant meets all of the criteria of a listed impairment, he is disabled; otherwise, the evaluation proceeds to Step Four. 20 C.F.R. § 404.1520(d)-(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers v. Comm'r of Soc. Sec. Admin.*, 582 F.3d 647, 653 (6th Cir. 2009) ("A claimant must satisfy all of the criteria to meet the listing."). In evaluating whether a claimant meets or medically equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (noting that, without such analysis, it is impossible for a reviewing court to determine whether substantial evidence supported the decision).

Listing 11.09 establishes the automatic disability criteria for multiple sclerosis in two parts: A and B.  20 C.F.R. pt. 404, Subpt. P, App. 1 § 11.09.  To satisfy the paragraph A criteria, the claimant must show he has: "Disorganization of motor function in two extremities … resulting in an extreme limitation … in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities."  Id. § 11.09A.[4]  "Disorganization of motor function" is defined as "interference, due to your neurological disorder, with movement of two extremities."  Id. § 11.00D1.

"Extreme limitation" is defined as: (i) the inability to stand up from a seated position; (ii) the inability to maintain balance in a standing position and while walking; or (iii) the inability to use one's upper extremities to independently initiate, sustain, and complete work-related activities.  Id. § 11.00D2.  An inability to stand up or maintain balance requires "the assistance of another person or an assistive device, such as a walker, two crutches, or two canes."  Id. § 11.00D2a-b.  An inability to use one's upper extremities refers to a loss of function of both upper extremities that "seriously limits" the claimant's ability to perform work-related activities involving fine and gross motor movements.  Id. § 11.00D2c.  Examples of fine and gross motor movements include pinching, manipulating, fingering, handling, gripping, grasping, holding, turning, reaching, lifting, carrying, pushing, and pulling.  Id.

The ALJ failed to apply proper legal standards in evaluating whether Pritt had an impairment that met or medically equaled Listing 11.09A.  42 U.S.C. § 405(g); Rogers, 486 F.3d at 241.  The ALJ determined that Pritt did not meet the criteria of Listing 11.09 because:

---

[4] Although Pritt cites the paragraph A and paragraph B criteria, he limits the substance of his Step Three challenge to arguing why the evidence establishes that he met the paragraph A criteria.  See ECF Doc. 11 at 15-18.  Thus, the court finds any argument that the ALJ erred in determining that Pritt did not satisfy the criteria of Listing 11.09B has been forfeited.  See Walp v. Saul, No. 4:18cv897, 2019 U.S. Dist. LEXIS 137407, at *7 n.4 (N.D. Ohio Aug. 14, 2019).

> The record[] does not demonstrate the claimant has disorganization of motor
> function as described in 11.04B; or a visual mental impairment as described under
> the criteria in 2.02, 2.03, 2.04, or 12.02; or significant, reproducible fatigue of
> motor function resulting from neurological dysfunction in areas known to be
> pathologically involved by the multiple sclerosis process … .  Examinations have
> shown that the claimant maintains reduced but functional upper extremity
> strength.  He sometimes uses a cane to prevent falls, but his gait is often normal
> (11F:7; 13F:5; 14F4; 15F6).

(Tr. 34).  As both parties have asserted, the ALJ applied an outdated version of Listing 11.09.

The current version does not require a visual mental impairment or reproducible fatigue, which

were required under the paragraph B and C criteria of the former version of the Listing.

*Compare* 20 C.F.R. pt. 404, Subpt. P, App. 1 § 11.09 (2020), *with* 20 C.F.R. pt. 404, Subpt. P,

App. 1 § 11.09 (2016); *Revised Medical Criteria for Evaluating Neurological Disorders*, 81 FR

43048 (effective September 29, 2016).  Although the paragraph A criteria for both the current

and former versions of Listing 11.09 require disorganization of motor function, they are not

defined in the same way.  The regulation the ALJ applied defined disorganization of motor

function as: "Significant and persistent disorganization in two extremities, resulting in sustained

disturbance of gross and dexterous movements, or gait and station … ."  20 C.F.R. pt. 404,

Subpt. P, App. 1 § 11.04B (2016).  Application of the wrong version of the listings criteria can

be a basis for remand.  *See Gonzalez v. Comm'r of Soc. Sec.*, No. 1:10-CV-1608, 2011 U.S. Dist.

LEXIS 133723, at *9 (N.D. Ohio Nov. 18, 2011).

      The Commissioner argues that the ALJ's application of an outdated version of Listing

11.09 was harmless because the ALJ focused on Pritt's motor function, such that "his conclusion

would have remained the same based upon his thorough analysis of Plaintiff's motor function."

ECF Doc. 13 at 14.  One could not characterize the ALJ's analysis of Listing 11.09, quoted

above, as "thorough."  However, the Commissioner has shown that the ALJ's error was

harmless.

21

An ALJ's misapplication of his findings to an outdated version of a Listing can be harmless when the claimant did not put forth sufficient evidence to demonstrate that he met or medically equaled the listing criteria.  *See Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 365 (6th Cir. 2014); *see also Norris v. Comm'r of Soc. Sec.*, No. 20-12054, 2021 U.S. Dist. LEXIS 205062, at \*30-31 (E.D. Mich. Oct. 6, 2021), *report and recommendation adopted*, 2021 U.S. Dist. LEXIS 203730 (E.D. Mich. Oct. 22, 2021).  Contrary to Pritt's argument, he has not presented sufficient evidence to establish that he was *unable* to stand up from a seated position or maintain balance in a standing position or while walking.  ECF Doc. 11 at 16.  Having difficulty rising from a seated position is not the same as being unable to do so.  And although the record documents Pritt's use of a *single* cane, he has pointed to no evidence indicating that he used *two* canes, *two* crutches, or a walker.  20 C.F.R. pt. 404, Subpt. P, App. 1 § 11.00D2a-b.

Although Pritt cites treatment records documenting balance issues, diminished strength, and sensory deficits in his lower extremities, Pritt has pointed to only one instance in which he has required the assistance of another to maintain his balance.  Specifically, he cited a May 1, 2019 physical therapy note in which Pritt was observed to be ambulating while holding his wife's arm.  ECF Doc. 11 at 16; *see* (Tr. 380).  But that was before he was prescribed a cane. *See* (Tr. 929 (May 23, 2019 treatment notes stating that Pritt could "ambulate without devices and perform activities of daily living at a Mod[erately] independent level with quad cane")). And one physical therapy note does not suffice to establish that Pritt was *incapable* of standing or walking without the assistance of another person.  *Cf.* (Tr. 819 (May 17, 2019 physical therapy notes stating that Pritt had walked four blocks), 955 (May 10, 2019 physical therapy notes stating that Pritt was taking frequent long walks)).

The regulations require that the limitation on physical functioning "must last or be expected to last at least 12 months." 20 C.F.R. pt. 404, Subpt. P, App. 1 § 11.00G3a.  With the exception of Pritt's August 4, 2019 visit, there was no mention in the more recent treatment notes that Pritt required the assistance of another person to stand or walk.  (Tr. 878, 884); *see also* (Tr. 894-98, 1214-17, 1269-72, 1296-97, 1303, 1309, 1311, 1327-29, 1361-62, 1364-65, 1384).  And the more recent evidence, dating from least March 2020 and upon which the ALJ relied in his Step Three analysis, showed: (i) normal gait and station (Tr. 1377, 1380, 1393, 1418); (ii) 5/5 lower extremity strength and 4/5 hip strength (Tr. 1376, 1393, 1429); and (iii) normal lower extremity range of motion (Tr. 1379).  (Tr. 34).  It is apparent, then, from the ALJ's specific findings and the medical evidence, that the ALJ would not necessarily have found that Pritt had an extreme limitation under Listing 11.00D2a-b.  *Norris*, 2021 U.S. Dist. LEXIS 205062, at *34-35.

Whether Pritt put forth sufficient evidence to establish that he was unable to use his upper extremities is a closer question, but the court ultimately finds no reversible error.  There is evidence in the record that Pritt had difficulties using his upper extremities to perform fine and gross motor movements, such as: (i) his testimony of his inability to lift, carry weight, and button clothing (Tr. 16-17, 19); (ii) his testimony of and treatment notes documenting his reliance on his wife to wash his hair, shave, put on a shirt, and don socks (Tr. 20, 376, 906, 913-14, 954-55); (iii) his subjective symptom complaints to providers of his difficulty grabbing objects, numbness, and difficulty reaching overhead (Tr. 878, 895, 900, 906, 915, 924, 929, 944, 946, 954, 958, 961-62, 965-66, 969, 999, 1001, 1009, 1011-12, 1016, 1019, 1024-25, 1259, 1270, 1415-16, 1426); and (iv) objective exam findings of upper extremity numbness, tingling, decreased sensation,

decreased shoulder range of motion, and decreased dexterity and strength (Tr. 880, 916, 929-30, 966, 1001, 1025, 1215-16, 1265, 1429).

There is evidence, however, to support the conclusion that Pritt, while limited, was not incapable of using his upper extremities.  This evidence included objective exam findings documenting: (i) between 3-/5 and 5/5 hand strength (Tr. 880, 898, 929-30, 959, 966, 1001, 1013, 1260, 1265, 1270, 1376-77, 1418, 1429; (ii) between 4/5 and 5/5 upper extremity strength (Tr. 898, 929-30 980, 995, 1013, 1216, 1365; (iii) between 3-/4 and 3/4 shoulder flexion range of motion and between 4-/5 and 5/5 strength (Tr. 901, 913, 916, 959, 966-67, 1376); (iv) full extremity range of motion but 3/5 shoulder abduction and adduction (Tr. 880); (v) intact light touch sensation but decreased vibratory sensation (Tr. 1216); and (vi) "Good hand function," with normal range of motion.  (Tr. 1377-80).  In addition, there were physical therapy notes indicating that: Pritt could dress, bathe, and take care of personal grooming with moderate independence (Tr. 900, 907, 967, 1002); Pritt could zip and button clothing (Tr. 967); and that Pritt completed hand manipulation tasks with minimal difficulty (Tr. 947).

The court is mindful that in determining whether an ALJ's error was harmless the court must not resolve evidentiary conflicts in the first instance.  *Rabbers*, 582 F.3d at 657; *Juarez v. Astrue*, No. 2:09-CV-160, 2010 U.S. Dist. LEXIS 18090, at *17 (E.D. Tenn. Feb. 8, 2010).  But reading the ALJ's decision and a whole and with common sense, how the ALJ weighed the evidence becomes apparent.  *Buckathorn ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010).  At Step Three, the ALJ found that the more recent, post-March 2020 objective examinations showed that Pritt had reduced but functional upper extremity strength.  (Tr. 34).  And in his analysis of Pritt's subjective symptom complaints, the ALJ relied primarily on Pritt's "generally unremarkable" objective examination results, including a finding that he "typically

maintains at least 4/5 strength in his bilateral upper … extremities."  (Tr. 40 (citing Tr. 307, 437, 1192, 1216, 1244, 1261, 1393, 1418)).  It is evident from the ALJ's decision that he resolved the any conflicts in the evidence against Pritt.  Thus, even had the ALJ applied the correct version of Listing 11.09, he necessarily would have found that Pritt did not have an extreme limitation under Listing 11.00Dc and, by necessity, the criteria of Listing 11.09A.  *Norris*, 2021 U.S. Dist. LEXIS 205062, at *34-35.

Lastly, Pritt's medical equivalency argument has not established a basis for remand.  Because the ALJ determined that Pritt's impairments did not meet or medically equal a listed impairment, the ALJ was not required to obtain an expert.  *See* SSR 17-2p, 2017 SSR LEXIS 2, at *10 (Mar. 27, 2017) (stating that an ALJ is not required to obtain a medical expert if the ALJ believes the evidence does not reasonably support a finding of equivalency).  And Dr. Koch's and Dr. Hinzman's signature on the decision transmittal forms constitutes probative evidence that medical equivalence was considered.  (Tr. 65, 88); *see Hicks v. Comm'r of Soc. Sec.*, 105 F. App'x 757, 762 (6th Cir. 2004).

Because Pritt failed to put forward sufficient evidence to demonstrate that he met, or possibly could meet, the criteria for Listing 11.09A, the ALJ's application of an outdated version of the Listing was harmless.  And the ALJ was not required to obtain a medical opinion on the issue of equivalency.  Thus, Pritt has not established a basis for remand on account of the ALJ's Steep Three analysis of Listing 11.09A.

C.       **Step Four – Opinion Evidence**

Pritt argues that the ALJ failed to apply proper legal standards in his evaluation of

Dr. Di Lorenzo's opinions.  ECF Doc. 11 at 18-23.  Pritt argues that the ALJ's analysis was

perfunctory and flawed, because Dr. Di Lorenzo identified symptoms to support her opinions

and because the limitations expressed in her opinions were consistent with her treatment notes,

consistent with one another, consistent with treatment notes of other medical sources, and

consistent with imaging test results.  ECF Doc. 11 at 19-22.  Pritt argues that the ALJ's omission

of any reference to a great body of supporting evidence while relying on six exhibits constituted

selective parsing of the record and was an insufficient basis upon which to find Dr. Di Lorenzo's

opinions unpersuasive.  ECF Doc. 11 at 22-23.  The Commissioner disagrees.  ECF Doc. 13 at

18-20.

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's

RFC after considering all he medical and other evidence in the record.  20 C.F.R. § 404.1520(e).

In doing so, the ALJ is required to "articulate how [he] considered the medical opinions and

prior administrative medical findings."  20 C.F.R. § 404.1520c(a).  At a minimum, the ALJ must

explain how he considered the supportability and consistency of a source's medical opinion(s),

but generally is not required to discuss other factors.  20 C.F.R. § 404.1520c(b)(2).  And when an

ALJ finds persuasive some parts of a medical opinion and not others, he must explain why the

parts of the opinion which conflict with his RFC findings were not adopted.  *See Davis v.*

*Comm'r of Soc. Sec.*, No. 5:20-cv-2807, 2021 U.S. Dist. LEXIS 244915, at *29 (N.D. Ohio Nov.

24, 2021) (citing SSR 96-8p, 1996 SSR LEXIS 6 at *7 (July 2, 1996)).

The ALJ sufficiently applied proper legal standards in his analysis of Dr. Di Lorenzo's

opinions and reached a decision supported by substantial evidence.  42 U.S.C. § 405(g); *Rogers*,

486 F.3d at 241.  The ALJ addressed both of Dr. Di Lorenzo's opinions together, concluding that they were "not entirely persuasive" because: "She does not provide medical support for the specific limitations she describes, and the claimant's physical examinations do not support those limitations (1F:11, 141; 4F:59, 83; 5F7; 6F:7; 13F5; 14F:4).  However, I have considered Dr. [Di] Lorenzo's statements in limiting the claimant to sedentary work."  (Tr. 40-41).

The ALJ complied with the regulations when he grouped Dr. Di Lorenzo's opinions and analyzed them together.  20 C.F.R. § 404.1520c(b)(1).  The ALJ also expressly considered the supportability of Dr. Di Lorenzo's and the consistency of her opinions to the medical evidence when the ALJ remarked on the adequacy of her explanation for her findings, cited some of Dr. Di Lorenzo's treatment notes, and cited treatment notes from other providers.  Specifically, the ALJ cited: (i) Dr. Di Lorenzo's June 11, 2019 treatment notes (Tr. 307, 1192); (ii) Dr. Morton's May 29, 2018, August 29, 2019, December 13, 2019, and June 25, 2020 treatments notes (Tr. 437, 1244, 1261, 1418); and (iii) MetroHealth treatment notes from August 15, 2019 and March 4, 2020 (Tr. 1216, 1393).  (Tr. 41).  And the ALJ discussed the adequacy of Dr. Di Lorenzo's explanations and the lack of objective support in Dr. Di Lorenzo's medical records for some of the limitations in her opinion.  Although the ALJ's discussion was hardly elaborate, it was sufficient to satisfy the regulatory requirement that he analyze the supportability and consistency factors.  20 C.F.R. § 404.1520c(b)(2); *cf. Duke v. Comm'r of Soc. Sec.*, No. 5:21-cv-39, 2022 U.S. Dist. LEXIS 66908, at *20 (N.D. Ohio Jan. 11, 2022), *report and recommendation adopted*, 2022 U.S. Dist. LEXIS 66864 (N.D. Ohio Apr. 11, 2022).

There is some support for Pritt's claim that the ALJ erred in how well he explained his analysis of Dr. Di Lorenzo's opinion.  The ALJ stated that, despite not fully crediting Dr. Di Lorenzo's opinions, he nevertheless considered them.  But the ALJ did not say which findings

from which opinion were incorporated into the RFC or why. The ALJ did not say in what way Dr. Di Lorenzo's explanation for her opinions did not constitute medical support for the specific limitations in her opinions. The ALJ did not explain in what way the objective exam findings stated in the exhibits he cited contradicted Dr. Di Lorenzo's opinions. And, to Pritt's point, the ALJ did not explain why he chose to highlight objective exam findings from eight treatment notes, to the exclusion of others, including Dr. Di Lorenzo's more recent objective exam findings, to support his conclusion. These omissions inhibit the ability of the court, as a future reviewer, in our analysis of the ALJ's reasoning. *Fleischer*, 774 F. Supp. 2d at 877.

Nevertheless, I find that the ALJ's minimal compliance with the regulation's articulation requirements did not cause harmful error. *Rabbers*, 582 F.3d at 654. Viewing the ALJ's decision as a whole and with common sense, we can identify which portions of Dr. Di Lorenzo's opinions were rejected. *See Buckhannon ex rel. J.H.*, 368 F. App'x at 678–79. The ALJ's RFC finding that Pritt could perform work at the sedentary level necessarily implied a finding that Pritt could: (i) lift/carry 10 pounds occasionally; (ii) stand/walk for no more than 2 hours; and (iii) sit for 6 hours. (Tr. 35); *see* SSR 96-9p, 1996 SSR LEXIS 6, at *8-9 (July 2, 1996) (defining work at the sedentary exertion level). Thus, the ALJ rejected from Dr. Di Lorenzo's June 2019 opinion her opinion on some of Pritt's postural limitations, Pritt's manipulative limitations, and his need for additional break times. *Compare* (Tr. 35-36), *with* (Tr. 872-73). From the February 2020 opinion, the ALJ rejected Dr. Di Lorenzo's opinion on Pritt's: (i) lifting/carrying/ walking limitations; (ii) need to alternate positions and elevate his legs; (iii) postural and manipulative limitations; and (iv) need for additional break times. *Compare* (Tr. 35-36), *with* (Tr. 1377-78).

The ALJ's first basis for rejecting these limitations was for lack of adequate explanation. Although the ALJ did not expand upon his reasoning, it is not difficult for the court to discern how the ALJ reached his conclusion.  Dr. Di Lorenzo's explanation for her exertional, postural, and manipulative limitations consisted of a short list of symptoms.  *See* (Tr. 872-73, 1377-78). And she gave no explanation at all for her opinions on Pritt's need to alternate positions, elevate his legs, or take additional break times.  *See* (Tr. 873, 1378).  Listing symptoms without an explanation of how the symptoms could cause the restriction expressed in a checked box has been held to be insufficient explanation.  *See, e.g.*, *Davidson v. Comm'r of Soc. Sec.*, No. 2:17-cv-1121, 2020 U.S. Dist. LEXIS 20238, at *25 (S.D. Ohio Feb. 5, 2020); *Marks v. Comm'r of Soc. Sec.*, No. 1:16-cv-02848, 2018 U.S. Dist. LEXIS 20220, at *27 (N.D. Ohio Jan. 12, 2018). Giving no explanation at all has been held to be so inadequate as to render the opinion patently deficient.  *See, e.g.*, *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 474 (6th Cir. 2016); *Ellars v. Comm'r of Soc. Sec.*, 647 F. App'x 563, 566-67 (6th Cir. 2016).  The ALJ's supportability finding, therefore, complied with the regulation and was supported by substantial evidence.  It could also independently sustain the ALJ's decision to discredit part of Dr. Di Lorenzo's opinion.  *See Okonski v. Comm'r of Soc. Sec.*, No. 3:20-cv-1614, 2021 U.S. Dist. LEXIS 204564, at *30-31 (N.D. Ohio Oct. 25, 2021).

Moreover, the exhibits the ALJ cited also provided substantial evidence supporting his consistency determination.  The objective findings that the ALJ cited showed: (i) between 4/5 and 5/5 upper and lower extremity strength; (ii) intact light touch sensation; (iii) that Pritt could rise independently from a seated position; (iv) normal but slow gait; and (v) decreased cervical spine range of motion.  (Tr. 437, 1192, 1216 1244, 1260-61, 1393, 1418).  Although Pritt argues that the ALJ erred by not citing in his analysis of Dr. Di Lorenzo's opinions a greater body of

evidence, the ALJ summarized most of the treatment notes Pritt has relied on to make his argument.  *Compare* (Tr. 37-39), *with* ECF Doc. 11 at 19-22; *see also Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) (holding that it was enough for the ALJ to have listed elsewhere in his decision the evidence upon which he determined an opinion inconsistent).  As Pritt has effectively argued, there is substantial evidence in the record that could support a different conclusion.  But it was not reversible error for the ALJ to resolve the inconsistencies in the record unfavorably to his position.  *Solembrino v. Astrue*, No. 1:10-CV-01017, 2011 U.S. Dist. LEXIS 58237, at *25 (N.D. Ohio May 27, 2011).

Although imperfect, the ALJ's analysis was sufficient to comply with the regulations and his conclusions were reasonably drawn from the evidence.  Therefore, the court finds that Pritt has not established basis for remand on account of the ALJ's evaluation of the opinion evidence.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the [ALJ] must stand if the evidence could reasonably support the conclusion reached).

**D.     Step Four – Subjective Symptom Complaints**

Pritt argues that the ALJ failed to apply proper legal standards in his analysis of Pritt's subjective symptom complaints.  ECF Doc. 11 at 23-25.  Pritt argues that the ALJ's one-sentence explanation for his RFC findings was too perfunctory to allow for meaningful review and overemphasized his gait, while ignoring evidence Pritt contends is consistent with his reports of pain and fatigue stemming from his multiple sclerosis and cervical pain.  ECF Doc. 11 at 24.  Pritt argues that his symptoms warranted greater limitations, such as additional breaks in excess of the tolerable amount of off task behavior.  *Id.*  The Commissioner disagrees.  ECF Doc. 13 at 22-24.

As stated above, at Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. § 404.1520(e).  The RFC is an assessment of a claimant's ability to do work despite his impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant.  20 C.F.R. § 404.1529(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms.  *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989).  Nevertheless, an ALJ is not required to accept a claimant's subjective symptom complaints and may properly discount the claimant's testimony about his symptoms when it is inconsistent with objective medical and other evidence.  *See Jones*, 336 F.3d at 475–76; SSR 16-3p, 2016 SSR LEXIS 4, at *15 (Mar. 16, 2016).  In evaluating a claimant's subjective symptom complaints, an ALJ may consider several factors, including the claimant's daily activities, the nature of the claimant's symptoms, the claimant's efforts to alleviate his symptoms, the type and efficacy of any treatment, and any other factors concerning the claimant's functional limitations and restrictions.  SSR 16-3p, 2016 SSR LEXIS 4, at *15; 20 C.F.R. § 404.1529(c)(3).

If an ALJ discounts or rejects a claimant's subjective complaints, he must clearly state his reasons for doing so.  *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).  The ALJ need

31

not explicitly discuss each of the factors.  *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012).  And although the ALJ must discuss significant evidence supporting his decision and explain his conclusions with sufficient detail to permit meaningful review, there is no requirement that the ALJ incorporate all the information upon which he relied into a single tidy paragraph.  *See Buckhannon ex rel. J.H.*, 368 F. App'x at 678–79.

The ALJ applied proper legal standards and reached a decision supported by substantial evidence in his evaluation of Pritt's subjective symptom complaints.  42 U.S.C. § 405; *Rogers*, 486 F.3d at 241.  The ALJ complied with the regulations by: (i) assessing Pritt's RFC in light of the medical evidence, his testimony, and other evidence in the record; and (ii) clearly explaining that he rejected Pritt's subjective symptom complaints because his statements regarding the intensity, persistence, and limiting effects of his symptoms were not consistent with the objective evidence.  20 C.F.R. § 404.1520(e); SSR 16-3p, 2016 SSR LEXIS 4, at *9-10; (Tr. 35-41).

Contrary to Pritt's argument, the ALJ did not give a boilerplate explanation for discounting his subjective symptom complaints.  The ALJ gave sufficiently clear reasons for his RFC findings when he stated:

> The above evidence is not entirely consistent with the claimant's allegations that his unable to perform any work.  The record confirms that the claimant has multiple sclerosis, and degenerative disc disease in his back and neck.  These severe impairments create functional limitations that interfere with the claimant's ability to work.  However, the above [RFC] accommodates those limitations by restricting the claimant to a limited form of unskilled sedentary work with additional limitations on his ability to reach, handle, finger, and feel.  The medical record also shows that the claimant's physical examinations have been generally unremarkable.  He sometimes uses a cane, but his gait is often normal.  He typically maintains at least 4/5 strength in his bilateral upper extremities and lower extremities … .

(Tr. 40) (citations omitted).  It is apparent from the ALJ's analysis that he considered Pritt's pain symptoms and discounted them on account of his objective exam findings.  And the ALJ cited

32

substantial evidence to support that determination, including treatment notes documenting between 4/5 and 5/5 upper extremity strength, Pritt's ability to rise from a seated position, and his normal gait.  *See* (Tr. 40 (citing Tr. 307, 1216, 1244, 1261, 1393, 1418)).  And intertwined with the ALJ's discussion of the medical and nonmedical evidence were findings inconsistent with the severity of Pritt's stated pain limitations.  Such evidence included: (i) additional objective exam findings of between 4/5 and 5/5 upper extremity strength, the ability to rise without difficulty from a seated position, and normal gait; (ii) Dr. Morton's August 29, 2019 note, which noted that Pritt "is able to ambulate without devices and perform activities of daily living at a[n] independent level" (Tr. 1243); and (iii) normal range of motion in all joints (Tr. 1375).  (Tr. 36-39); *see Buckhannon ex rel. J.H.*, 368 F. App'x at 678–79.

Although the ALJ did not specifically address Pritt's fatigue symptoms, he acknowledged Pritt's fatigue when he discussed his testimony, including his need for frequent daytime naps, as well as how he discussed treatment notes in which Pritt reported fatigue symptoms.  (Tr. 36-38).  Intertwined with the ALJ's discussion of the medical evidence and nonmedical evidence were findings that would be inconsistent with Pritt's stated fatigue limitations, such as: (i) Pritt's statements to Dr. Morton on June 25, 2020 of reduced fatigue (Tr. 1416); (ii) Dr. Bradford's examination notes, in which Pritt did not report fatigue as a symptom (Tr. 1374); (iii) physical therapy notes in which it was noted that, despite fatigue, Pritt showed good balance and technique (Tr. 1166); (iv) physical therapy notes indicating that Pritt walked regularly (Tr. 931, 940, 948, 970); and (v) Dr. Morton's treatment notes indicating that Pritt was functioning independently and without assistance.  (Tr. 37-39).

Because the ALJ applied proper legal standards and his conclusions were reasonably drawn from the evidence, the ALJ's evaluation of Pritt's subjective symptoms complaints fell

within the Commissioner's "zone of choice" and cannot be disturbed by this court. *Mullen*, 800 F.2d at 545; *see also O'Brien*, 819 F. App'x at 416; *Jones*, 336 F.3d at 477.

IV.     **Conclusion**

Because any error in the ALJ's analysis of Listing 11.09 was harmless and because the ALJ otherwise applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Pritt's applications for DIB and SSI is affirmed.

**IT IS SO ORDERED.**

Dated: June 14, 2022

Thomas M. Parker
United States Magistrate Judge